HARRIS, Judge,
dissenting.
I respectfully dissent: This is an adoption contest between the maternal grandmother and the former boyfriend of the deceased mother.
These are the facts. In 1983 James Robb, then 27 years old, met Briana, then 13 years old, and started cohabiting with her. They lived as husband and wife.[1] In 1985 Briana gave birth to a child and Robb was listed as the father on the birth certificate. The couple continued to cohabit until 1987 when Briana and the child moved to California. That was the last time Robb saw the child during Briana’s life. Although Briana and the child subsequently returned to Florida, no effort was made to locate or contact Robb. In 1989, while she was living with a new “boy friend” Briana committed suicide and her child was left with the child’s maternal uncle.[2]
When Robb learned of Briana’s death, he filed a paternity action seeking to legally establish himself as the father of the child and named the uncle and grandmother as defendants.[3] Both defendants contested *894 the paternity action until the child became ill; the uncle, unable to afford the medical expenses and ineligible (because he did not have legal custody) to qualify for HRS assistance, then withdrew from the paternity action and entered into an agreement “transferring custody of the child” to Robb. The grandmother, appellant herein, continued to contest the paternity action.
HLA testing proved that Robb was not the father of the child and the paternity action was dismissed. The court permitted Robb to file a petition for adoption and the grandmother counterpetitioned for adoption. The court ruled in favor of Robb, permitting him to adopt this now six-year-old girl.
The facts of this case made the custody issue difficult.[4] However, I urge that the court erred in two respects:
1. The court relied on facts not established by the record. The court found that “since the birth of [the child] ... Robb has maintained continuous contact with the child and in all respects has acted in a manner consistent with being the child’s natural father.” Robb admits that he did not see the child for over two years (June, 1987 until after August, 1989) and provided no support for her after December, 1987.
2. The court interpreted section 63.0425, Florida Statutes (1989) to deny the grandmother a statutorily mandated priority for adoption.[5] The statute provides:
When a child who has lived with a grandparent for at least six months is placed for adoption, the agency or intermediary handling the adoption shall notify that grandparent of the impending adoption before the petition for adoption is filed. If the grandparent petitions the court to adopt the child, the court shall give first priority for adoption to that grandparent.
The trial court linked the six month residency requirement for notice contained in the first sentence to the grandparent’s priority rights contained in the second sentence. I submit that the better interpretation (and the one I believe the legislature intended) is that the grandparent, whether he or she files as a result of the notice provided in the first sentence or files independently thereof and even if the grandparent has never had custody, such grandparent should nevertheless have priority over a stranger in the adoption of the grandchild.
This linkage of the two sentences was considered by the court in Davis v. Dixon, 545 So.2d 318 (Fla. 3d DCA 1989), rev. denied, 551 So.2d 460 (1989). The court held:
We find that the trial court erred in failing to accord the grandparents the priority of the statute. The appellee advances the position that the priority can only be granted in an agency proceeding for adoption, referring to the first sentence of the subsection of the statute[.] We disagree, and find that the first section provides instances wherein the grandparents shall have notice of certain agency adoption proceedings, and the second sentence gives grandparents a priority consideration in adoptions. [Footnote omitted.]
Davis at 319.
This interpretation also is consistent with the legislative history of Fla.H.B. 1407, Committee on Health and Rehabilitative Services Staff Analysis, Section 1(B) (Reg. Sess.1987):
The changes proposed in H.B. 1407 address many of the concerns expressed by the Adoption Advisory Council in its annual report. In addition to the council’s *895 recommendations, the legislation also provides that a child voluntarily placed for adoption is a dependent child. The legislation provides further clarification on voluntary consents for termination of parental rights. Finally, the legislation requires notification of grandparents of impending petition for adoption of a grandchild if the grandchild has lived with the grandparent for at least six months. Grandparents are also to be given first priority for adoption of the child except under certain circumstances. [Emphasis added.]
Those circumstances are: when a different preference is set out in the deceased parent’s will; a stepparent adoption; or if the “best interest of the child” requires otherwise. Section 63.0425(2), (3) and (4), Florida Statutes (1991).
This interpretation is also logical in that it recognizes the reality that it is the grandparent that is most often called up — and is there — when health or financial problems befall the child or the child’s family. It is most often the grandparent that has maintained, through visitation and contact, a closer relationship with the child than even the deceased parent’s siblings or other relatives. It is the grandparent that is presumed by the intestacy laws to be closer to the parent than anyone other than the parent’s lineal descendants.
Certainly there are situations in which the grandparent would not be appropriate — because of age, physical condition, financial condition, personality, character, etc. — as the adoptive parent. But that would not be the normal situation and priorities are established based on normal, expected conditions. The adoption scheme recognizes that grandparent priority will not prevail if it is inconsistent with the “best interest of the child.” That is sufficient protection against the abnormal situation.
Since the trial court failed to recognize the statutory priority, I would reverse for further consideration. The majority instead has weighed the evidence in light.of the priority and has found it sufficient to overcome the priority. While I disagree with the majority’s conclusion on this issue, I more strongly disagree with the majority’s making this initial, critical determination in the first instance. That is the function of the trial court. The trial judge did not find that the grandmother’s priority was overcome by a “best intent of the child” analysis. I would not assume that the trial court — faced with the priority— would make the determination now mandated by the majority. The grandmother is entitled to have the court make this important decision using the correct law.
I would reverse.

.The majority states that Robb wanted to marry Briana. He did not marry her but he did cohabit with her in five states. There is nothing romantic about the seduction of a thirteen year old girl by a twenty-seven year old man. We normally view such conduct in the context of criminal prosecution. See State v. Johns, 576 So.2d 1332 (Fla. 5th DCA 1991) in which we held that the young girl's consent, based on payment, did not justify a downward departure. Concerning the “consent to marriage” given by Briana’s mother, (which consent would have been invalid under section 741.0405(4), Florida Statutes (1991) in any event), she at least had the excuse of being drunk. But she now has not had a drink in five years. Robb’s relationship with the young girl, on the other hand, was by design. He assisted her in running away from home. As Briana’s brother testified at the hearing:
Q. [H]ow young were you when you met Mr. Robb?
A. I think I was eleven because my sister was thirteen.
Q. Okay. Now, at that time, what kind of activities did you engage in when you were in the presence of Mr. Robb?
A. Sometimes it was pretty wild, you know, different things, we drank a lot and smoked pot, you know. Basically, that’s all I ever did was just drink and kind of stay out the way, you know.
I had run away a few times with him and my sister. That’s all I ever did was just drink and get high and stay out of the way.
⅜ * * * * *
Q. Okay. And when you did run away from home, did Mr. Robb know where you were staying?
A. O, yeah, because he would bring us food and stuff.
******
Q. But to the best of your knowledge, did your mother know where you were?
A. No.
His previous conduct with Briana does not recommend him in this case.

. The relationship between Briana and Robb was certainly not close after 1987 when she moved to California and cut off all contact with him. One can only speculate as to their relationship prior to the birth of the child since Briana became pregnant by someone else. Briana’s conduct in returning to Florida without contacting Robb, even after planning her own demise, is her recommendation against this adoption.

. Although the majority indicates that Robb (as well as everyone else) thought he was the father, Briana denied to her brother that Robb was, in fact, the father. She, of course, was right.

. The majority mentions the grandmother’s "substance" (alcohol) abuse in the past; it fails to mention Robb’s use of illegal drugs at least up to a year and a half before the final hearing. It also fails to mention Robb’s convictions for disorderly intoxication (1987) and possession of cannabis (1987), and the requirement in his sentence that he attend a substance abuse program. Robb testified at the hearing that he still "drinks a few beers” on the weekend.

. The final judgment provided:
That the defendant, JUDITH DILLON, is the child’s maternal grandparent, but the court finds that the child has not lived with said defendant for at least six (6) months prior to being placed for adoption and therefore the defendant, JUDITH DILLON, does not have any priority for adoption of the child and stands in the same position as a stranger, i.e. that of the plaintiff, JAMES D. ROBB.